(No. 4662- ▮▮▮▮▮▮▮▮)

DIXON FRUIT COMPANY, A CORPORATION, AND UNITED STATES FIDELITY AND GUARANTY COMPANY, A CORPORATION, Claimants, *vs.* STATE OF ILLINOIS, Respondent.

*Opinion filed March 16, 1956.*

DIXON, DEVINE AND RAY, Attorneys for Claimants.

LATHAM CASTLE, Attorney General; EDWARD M. WHITE, Assistant Attorney General, for Respondent.

WHAM, J.

Claimants have brought this action under the provisions of Chapter 23, Par. 372(a), Ill. Rev. Stats., (1953 State Bar Association Edition), to recover damages caused by an escaped inmate of the Dixon State School on September 18, 1954. The damages claimed are for the destruction and loss of use of a truck owned by the Dixon Fruit Company, and for the subrogation interest of the United States Fidelity and Guaranty Company by reason of the existence of an insurance policy insuring the truck against this loss. The amount sued for is a total of $1,935.00, of which the claim of the United States Fidelity and Guaranty Company is $745.00. There appears to be no serious dispute with respect to the facts involving the loss of the truck, inasmuch as a stipulation was entered into by and between the parties at the outset of the hearing, wherein it was stipulated in the presence of Mr. George Presbrey, the hearing officer, as follows:

"Mr. Presbrey: Let the record show that it is stipulated by and between the parties to the claim, the Dixon Fruit Company, 302 East River Street, Dixon, Illinois, is a corporation organized, and authorized to conduct its business, under the laws of the State of Illinois, and doing business at the aforesaid address.

Let the record further show that on the 18th day of September, 1954, one Adolph Plachaoff was an inmate of a charitable institution known as the Dixon State School, located at Dixon, Illinois, over which the State of Illinois had and has control; that on the aforesaid date, September 18, 1954, the said Adolph Plachaoff escaped from said institution, and, while he was absent from said institution at liberty, he stole a truck belonging to claimant, Dixon Fruit Company, said truck being a Ford truck and belonging to aforesaid claimant.

Let the record further show that the Dixon Fruit Company on September 18, 1954 was the owner of said truck; that said Adolph Plachaoff, while in the act of removing or attempting to remove and make away with said truck, and while it was in his possession, set fire to said Ford truck.

Let the record further show that claimant carried a policy of insurance with United States Fidelity and Guaranty Company, which was in full force and effect on September 18, 1954, and which provided partial but not complete coverage for loss or damage by fire. That said insurance company, according to the terms of the policy, paid to complainant $745.00. That claimant executed and delivered to United States Fidelity and Guaranty Company its subrogation receipt for the sum so paid, and said insurance company now stands subrogated to claimant to the extent of $745.00, and is entitled to receive said amount from the proceeds of this claim, if and when the same shall be allowed.

Let the record further show that on the 21st day of October, 1954, in compliance with the statutes of the State of Illinois, claimants presented to the Director of the Department of Public Welfare of the State of Illinois its claim for compensation for damages and loss herein complained of or which may hereafter be established by proof.

Let the record further show that the aforesaid claim has been investigated and processed by the Department of Public Welfare as required by statute and departmental rules and regulations."

There are two questions raised by respondent respecting the claim: First, that claimants have failed to establish a compliance with the statute upon which their right to recover is specifically and exclusively predicated; and, Second, the amount of damages is questioned.

Dealing with the first question, it is respondent's position that, since the Department of Public Welfare did not recommend an award to claimants, this Court lacks jurisdiction to determine the claim.

The particular statute involved reads as follows:

"372a. Claims for damages caused by escaped inmates of charitable, penal and reformatory institutions. § 1. Whenever a claim is filed with the Department of Public Welfare, or the Department of Public Safety, or the Youth Commission for damages resulting from property being stolen, heretofore or hereafter caused by an inmate who has escaped from a charitable, penal, reformatory or other institution over which the State of Illinois has control while he was at liberty after his escape, the Department of Public Welfare, or the Department of Public Safety, or the Youth Commission, as

the case may be, shall conduct an investigation to determine the cause, nature and extent of the damages inflicted, and if it be found after investigation that the damage was caused by one who had been an inmate of such institution and had escaped, the said Department or Commission may recommend to the Court of Claims that an award be made to the injured party, and the Court of Claims shall have the power to hear and determine such claims."

Inasmuch as the effect of the statute and the jurisdiction of this Court to proceed under the terms of the statute have been questioned, we deem it necessary to review the law both before and after the enactment of the statute in order to determine our power to proceed under it.

It is to be noted that the statute was originally enacted by the 59th General Assembly, and was approved June 21, 1935. It has only been amended once, being in 1953, as above set forth. Prior to the enactment of the statute in 1935, the law of Illinois was clear that there could be no recovery against the State of Illinois for theft, damage to property, or injury to a person caused by an escaped inmate of a charitable or penal institution operated by the State of Illinois. This was so, due to the fact that, in its operation of such an institution, the state engaged in its governmental capacity, and was not liable to respond in damages for the negligence of its officers, agents or employees, nor for the acts of the inmates. This was announced in the decision of *Bangs* vs. *State of Illinois,* 8 C.C.R. 508, involving theft of property by an inmate of the Dixon State Hospital, who allegedly escaped by reason of respondent's negligence.

At the time this decision was rendered, the Court of Claims was operating under the 1917 Act, Chap. 37, Secs. 462-475, Ill. Rev. Stats., (1933 State Bar Association Edition), and the doctrine of governmental immunity was in full effect.

Shortly after the decision in the Bangs case, opinion filed on April 9, 1935, the original statute, under designation of Senate Bill No. 247, was passed and approved on June 21, 1935.

The original statute read as follows:

"55(6). Damages by escaped inmates of charitable institutions—Jurisdiction of Court of Claims. Section 1. Whenever a claim is filed with the Department of Public Welfare for payment of damages to property, or for damages resulting from property being stolen, heretofore or hereafter caused by an inmate who has escaped from a charitable institution over which the State of Illinois has control while he was at liberty after his escape, the Department of Public Welfare shall conduct an investigation to determine the cause, nature and extent of the damages inflicted, and if it be found after investigation that the damage was caused by one who had been an inmate of such institution and had escaped, the said Department may recommend to the Court of Claims that an award be made to the injured party, and the Court of Claims shall have power to hear and determine such claims."

The enactment of this statute, following so closely in point of time the decision in the Bangs case, leads us to the conclusion that the Legislature intended to avoid the bar of the doctrine of governmental immunity in such cases without entirely eliminating the doctrine.

Shortly after the enactment of this statute, the claim in the Bangs case was refiled under No. 2746, 10 C.C.R. 127. The Court dismissed the case on the grounds that claimant had not brought himself within the aforementioned statute, inasmuch as no investigation or recommendation had been made by the Department of Public Welfare. In passing on this question, the Court stated at page 129:

"As we view the matter, the statute contemplates the filing of a claim in the first instance with the Department of Public Welfare, and an investigation by said Department. If, as the result of such investigation, the Department finds that the damage was caused by an escaped inmate of a charitable institution over which the State had control, and while said inmate was at liberty after his escape, the Department may, but is not required to, recommend to this Court that an award be made to the injured party. Upon such

recommendation being made, and not until then, has this Court any jurisdiction to consider the matter."

It is to be noted in the above case that there was no action by the Department of Welfare whatsoever. Neither an investigation, nor a recommendation had been made by the Department. In the instant case, however, an investigation was made, but no specific recommendation was made. If we were to follow the Bangs case with respect to the requirement that a favorable recommendation of the Department of Welfare is necessary before this Court acquires jurisdiction, we would then be compelled to dismiss the instant case for lack of jurisdiction. This would be so even if the state did not raise the question initially, but rather did so by brief. We have held that even where the state fails to raise the question of the Court's jurisdiction, such question can and must be raised by this court on its own motion. *Sanders* vs. *State of Illinois*, 19 C.C.R. 181; *Flynn, Et Al* vs. *State of Illinois*, 19 C.C.R. 134; *Atkinson* vs. *State of Illinois*, 21 C.C.R. 429.

We have been unable to find a case raising the precise question involved herein. The stipulated facts in this case reflect that an investigation was made, and that it was determined with sufficient certainty, to at least satisfy respondent, that an escaped patient of the Dixon State School stole a motor vehicle, and set fire to same. The facts further reflect that a claim was filed with the Department of Public Welfare on the 21st of October, 1954, and that the claim had been investigated and processed by the Department of Public Welfare, as required by the statute and the Departmental rules and regulations. Everything has been done, and is in order, except that the record is silent as to the specific recommendation made by the Department.

We do note, however, a portion of the Departmental Report consists of a letter to the Director of the Department of Public Welfare, signed by the Superintendent of the Dixon State School, which letter is written in the form of an answer to the complaint. This letter in no way recommends either the allowance or denial of the claim. It states that a patient of the Dixon State School admitted setting fire to the truck on September 18, 1954. The letter also expresses an opinion with respect to the damage done to the truck. This letter was submitted to the Attorney General by the Director without comment. It, therefore, appears that the Department of Public Welfare has had an opportunity to make a recommendation one way or the other, but for some reason chose not to do so.

Did the Legislature intend the Department of Public Welfare to be the final arbiter of claims of this kind, and that by mere inaction or affirmative disapproval it could put an end to such claim? We think not, as a careful reading of the statute will reflect. The statute provides that the Department shall make an investigation and *"may recommend to the Court of Claims that an award be made to the injured party,* and the Court of Claims shall have the power to hear and determine such claim"*. If the Legislature intended the Department to be the final arbiter, there would be no reason to refer the matter to the Court of Claims. We think rather the Legislature intended that the Department could recommend favorable consideration if it saw fit, and that the Court of Claims would be entitled to either accept such recommendation, or, at least, take it into consideration. We do not believe, however, that, because of the lack of such favorable recommendation, the

Court of Claims could not hear and determine the claim itself. We, therefore, hold that the case of *Bangs* vs. *State,* 10 C.C.R. 128, insofar as it conflicts with our expressed views on this point, is not to be followed. We find that the Court does have jurisdiction to hear and determine this claim.

In exercising our jurisdiction over these claims, we are compelled to define the test that should be applied by us in determining and hearing these claims. It is to be noted that the statute makes no expressed provision in this regard. It merely states that ''The Court of Claims shall have the power to hear and determine such claims''.

Since the 1945 amendment to the Court of Claims Act, the doctrine of governmental immunity is no longer applied to claims against the state. Subsequent to the passage of the 1945 amendment, a case arose in this Court wherein an escapee from the Illinois Security Hospital, Menard, Illinois, an institution for the insane, operated by respondent, brutally assaulted claimant in . the case of *Malloy* vs. *State of Illinois,* 18 C.C.R. 137. Claimant predicated her case upon negligence, contending that the state negligently permitted the inmate to escape. The claim was allowed. In the event the Court had failed to find negligence, there would have been no recovery, since the state is not an insurer.

If this Court were to apply an absolute liability test with respect to those actions coming under the statute involved herein, and yet require negligence to be proven in cases involving escaped convicts, patients, etc., wherein stolen property was not involved, it would be to confess a very anomalous situation in the law, and one which would, on its face, appear to be quite unreasonable.

By the 1953 amendment to the statute involved herein, the Legislature charged the Department of Welfare, the Youth Commission and the Department of Public Safety with the responsibility of investigating only those claims involving stolen property by escaped inmates. They removed the Departments' and Commission's jurisdiction to investigate those cases involving damage to property not stolen.

With respect to those claims involving stolen property, of which this is one, we believe the Legislature intended to expedite the handling of such claims, since the recovery of stolen property, and the investigation thereof are matters calling for the exercise of the state's police power, and the facts surrounding such crimes would, in many instances, be exclusively within the knowledge of the state. On the other hand, it is not necessarily a state function to investigate damage to either person or property of a tortious nature and not involving a crime. We think this is the reason the Legislature removed from the 1953 amendment the power of the Departments and Commissions to investigate claims for damage to property not stolen, theretofore contained in the statute, and retained that portion of the original statute giving power to the Department to investigate claims involving damages resulting from property being stolen.

We believe the Legislature enacted the 1953 amendment to the statute in the light of the present law governing the Court of Claims and the decisions under that Act, and intended that the Court of Claims should apply much the same test in determining claims under this statute, as the Court would apply to a case brought before it for damages caused by an escaped inmate to the person or property of another. The statute does not

spell out the test to be applied, but it is significant to note that nowhere in the statute is there any wording, which specifically directs the Court of Claims to apply the test of absolute liability. Such direction being absent, we will not presume that the Legislature so intended. It is more reasonable to presume that the Legislature intended the Court to utilize some discretion, and, we, therefore, until otherwise directed by the Legislature, will allow claims under the statute only in the event that we find the state to have been at fault.

Addressing ourselves to this question in the instant case, we have read the record, and find that Adolph Plachaoff, the escapee, had a record disclosing that he was a mental defective, and had been so committed since 1948. The testimony disclosed that he had a history of previous escapes and of incendiarism, all of which was known to respondent prior to the escape. Dr. Samuel J. Lipnitzky, a psychiatrist of the Dixon State School, testified on behalf of respondent that Adolph Plachaoff was kept in a cottage, which was not a maximum security cottage. He was not restricted, and was free to go and come by himself. This cottage was located in such a position where it would not be difficult for him to escape, he being only subject to detection by one police car patrolling the grounds. He had escaped prior to the instance involved herein. He had on July 8, 1954 been reported as being abusive to patients and employees, and was placed for some while in a maximum security cottage because of misbehavior. Dr. Lipnitzky further testified that patients of his type are no longer admitted to the Dixon State School.

It appears to us that respondent should have exercised more restrictive control over the movements of

this particular patient. It does not seem reasonable to us that a known mental defective, with an exhibited tendency toward incendiarism, should have been allowed to wander at will without supervision in an institution wherein there were no restraining walls or other means of controlling his movements. This is especially so in view of the institution's location with respect to the City of Dixon, wherein the property of many persons would be jeopardized by the activities of such a patient.

It is, therefore, our finding that respondent was negligent in failing to take further measures in controlling the activities of this particular patient, and should, therefore, respond in damages. *Malloy* vs. *State*, 18 C.C.R. 137.

With respect to the question of damages, it is claimant's contention that the truck was a total loss, and that its value at the time of the loss was $1,600.00.

From the record in this case, there does not appear to be a great difference of opinion as to the value of the truck, owned by the Dixon Fruit Company, prior to the fire. On December 23, 1954, Louis Berrettini, the manager of the Dixon Fruit Company, sent a letter to the Superintendent of the Dixon State School, in which he set forth the value of the truck, including the chassis and body. Respondent, State of Illinois, introduced this record as part of its Departmental Report. The total value of the truck is set forth at $1,415.00.

Claimant contends that the value of the truck prior to the burning was $1,600.00, and contends that Mr. Berrettini's opinion testimony offered at the hearing was undisputed in this respect. It is stated that, when he gave the value of the truck at the request of the Dixon State School authorities, he was referring to Blue Book

value. Nothing appears in the letter submitted to Mr. Wallace, Superintendent of the Dixon State School, concerning Blue Book value. It is stated in the letter: "Value of truck prior to fire: Chassis $815.00, Body $600.00, total $1,415.00". We accept this first estimate given by Mr. Berrettini. If Mr. Berrettini had determined that the Blue Book value was less than the actual value, it seems reasonable to us that he would have made some statement to that effect in the letter to Mr. Wallace.

The evidence established that the cost of repair would have been greater than the value of the truck. Claimant purchased a new truck, and received a total trade-in allowance for the salvaged truck in the amount of $530.62.

The applicable rule regarding damages is stated in *Blashfield's Cyclopedia of Automobile Law and Practice,* Vol. 6, p. 43, Sec. 3414, "Where a motor vehicle is damaged beyond repair, the measure of damage is the difference between the market value before the accident and the value of the wreckage".

In determining the value of the wreckage, respondent contends that the trade-in allowance should be considered as the fair cash market value of the salvaged truck. In considering this question, we cannot close our eyes to the fact that a damaged vehicle will in almost every instance command more value from the dealer on a trade-in for a new vehicle, than it would have, if sold for cash in the open market.

The courts of states other than Illinois have dealt with this question, and the cases are conflicting. Cases holding that a trade-in allowance can be used to establish value of the damaged vehicle are: *White* vs. *Halliburton Oil Well Cementing Company,* (1938) La. App. 183 So.

537; *Pender* vs. *Bonfanti,* (1943) La. App. 13 So. (2d) 105; *Carkuff* vs. *Geophysical Service,* (1938) La. App. 179 So. 490; *Boullion* vs. *Bonin,* (1940) La. App. 2 So. (2d) 535; and, *Shreveport* vs. *Vicksburg S. & P. R. Co.,* 167 La. 157, 118 So. 872.

On the other hand, cases, which distinguish between salvage value and trade-in value, hold that a trade-in value is not a proper basis to establish value of the wrecked vehicle. These cases are: *Carnes* vs. *Ditzenberger,* (1933) 163 Okla. 146, 21 P. (2d) 756; *Urquhart* vs. *Marty,* (1938) 61 R.I. 102, 200 A. 456.

We believe that a reasonable rule for this Court to follow would be one, which would allow evidence of a trade-in allowance to be considered in connection with all the facts and circumstances bearing on the question in determining the market value of the damaged vehicle, but that such evidence should in no way be conclusive.

The evidence concerning the trade-in allowance in this case is of some value in aiding us to determine the market value of the salvage. At least we may presume that it was worth no more than the $580.62 allowed. How much less it was worth is a difficult question to determine with absolute accuracy.

From the evidence, we must assume that the truck was not capable of being repaired economically. Consequently, its only value on the market was as junk and whatever parts might be salvaged therefrom.

The burden of proof on the question of damages as stated by the Supreme Court of Illinois in *N. V. C. & St. L. R.R.* vs. *Transit Lines,* 408 Ill. 336 at page 340 is, "The plaintiff has the burden of establishing the damages, which result from the defendant's tortious act, but, insofar as it may be contended that the damages might or should have been minimized by taking steps to

reduce the resulting damages, the burden of proof rests upon the defendant''.

The court there rejected a rule, which would have required plaintiffs, ''In cases involving destruction of property to have experts qualify to prove to what use the remaining material might be made, and determine whether any value existed over and above the cost of transportation, and many other factors, which would place upon a plaintiff in a law suit involving the question of damages to personal property an intolerable and unnecessary burden''.

The record in this case contains photographs of the truck, and considerable testimony concerning the damage thereto. Although there is no direct evidence that the salvage had any value, we have arrived at a value of $300.00 on it.

We realize this is to some extent speculative, but, since we are the finders of the facts, as well as the judges of the law, we have arrived at this amount taking into consideration the record as to the condition of the truck, and the fact that the salvage did command a rather substantial allowance on a trade-in basis.

It would, therefore, appear that the total damage to the truck amounted to $1,115.00.

The claimant, Dixon Fruit Company, also contends that it is entitled to a sum for the loss of use of the truck during thirty three days. Claimant's contention is based upon the fact that it originally intended to repair the truck, but some two or three weeks later found that the repairs could not be made, and was not able to replace the truck until thirty three days subsequent to the date of the accident. Claimant did not rent an additional truck, but contends that $15.00 a day should be allowed due to the extra wear and tear, and maintenance of its other

trucks, which were used on a double duty basis to take the place of the truck which was burned.

Respondent calls to the attention of the Court the well known rule of law restricting recovery of damages for loss of use to those cases where the motor vehicle is capable of being repaired. This rule has been announced in Illinois in *Crossen* vs. *C. & J. E. Ry. Co.*, 158 Ill. App. 42, and in *McDonell* vs. *Lake Erie & Western Railroad*, 208 Ill. App. 442 at page 450. This rule has been followed in other states, *German* vs. *Centaur Lime Company*, Mo. App. 295 S.W. 475; and, *Johnson* vs. *Thompson*, 35 Ohio App. 91, 172 N.E. 278; 169 A.L.R. 1074 at 1093.

Claimant contends that, even though the truck was replaced, it was necessary to first determine whether or not it could be repaired, and that about three weeks elapsed before this determination was made, and a total of thirty three days elapsed from the date of the accident to the time a new vehicle was procured.

Whatever the rule might be with regard to recovery of damages for loss of use in this situation, it is inescapable to us that the record does not reflect any evidence to show the value of any use to the claimant of the vehicle damaged, or to show that it suffered any damage through the deprivation of the use of the truck. Claimant admits that it did not lease another vehicle, that it lost no business, but merely spread the load to its other trucks.

We are unable to agree with claimant that the wear and tear and other expense distributed through its fleet of trucks would be the basis for awarding damages due to the loss of its use. If the truck had not been burned, it would have been subject to the same wear and tear and expense of operation that was spread throughout the balance of claimant's fleet of trucks.

A case fairly close on this question is *Balfour* vs. *Dohrn Transfer Company*, 328 Ill. App. 163, where an owner of a truck and trailer, which was damaged in an accident, was held not entitled to recover for the loss of use of the vehicle during the time it was repaired, where the owner owned two truck and trailer combinations, but only one was in operation at one time, and the owner made no effort to secure a substitute for the one that was damaged.

The fundamental reason for allowing damages for loss of use in some cases is to compensate the injured party for financial loss. If no financial loss can be established, then there is no reason to allow damages for loss of use. We, therefore, conclude that claimant is not entitled to any damages for loss of use claimed.

The claimant, Dixon Fruit Company, has received from claimant, United States Fidelity and Guaranty Company, the sum of $745.00 under the insurance policy, and has signed a subrogation receipt for such sum. It is, therefore, the judgment of this Court that claimant, United States Fidelity and Guaranty Company, shall receive the sum of $745.00, and claimant, Dixon Fruit Company, A Corporation, shall receive the sum of $370.00.